## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SYNQUILA WILLIAMS, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Civil No. 1:17-cv-2323 |
| v. | ) | |
| | ) | Magistrate Judge Susan E. Schwab |
| CORRECT CARE SOLUTIONS; JUSTIN | ) | |
| DONNARUMMA, DR. JACQUES | ) | |
| LECLERC; DR. REBECCA BURDETTE; | ) | |
| NURSE EMILIA SLAVOVA, and DR. | ) | |
| PAUL NOEL, | ) | |
| | ) | |
| *Defendants.* | ) | |

## AMENDED COMPLAINT

Plaintiff Synquila Williams, by and through her attorneys, brings this Section 1983 civil rights action against Defendants Correct Care Solutions, Justin Donnaruma, Dr. Jacques Leclerc, Dr, Rebecca Burdette, Nurse Emilia Slavova and Dr. Paul Noel.   This case stems from systematic constitutional violations at State Correctional Institution at Muncy ("SCI Muncy") by a correctional officer and the medical provider, Correct Care Solutions, Inc., ("CCS"), now known as Wellpath. Ms. Synquila Williams, who is incarcerated at SCI Muncy, seeks injunctive relief and damages against the Defendants for deliberate indifference to her serious medical needs under the Eighth Amendment and for violating her First Amendment right to be free from retaliation.

Ms. Williams suffers from diabetes, which Defendant Correct Care Solutions and named medical Defendants have failed to treat. This has resulted in health complications, including neuropathy and gastrointestinal problems. These failures range from failure to appropriately monitor her diabetes to providing ineffective medication and withholding pain medication, to not allowing Ms. Williams to see outside specialists when recommended by her doctors. Defendant Correct Care Solutions and named medical defendants have been deliberately indifferent to Ms. Williams' serious medical needs related to her diabetes and resulting neuropathy, causing her unnecessary and wanton pain in violation of the Eighth Amendment.

Moreover, Ms. Williams filed multiple complaints and grievances against Defendant Donnarumma and a fellow correctional officer. Defendant Donnarumma then violated Ms. Williams' First Amendment right to be free from retaliation by laughing at her when she reported a fear of being sexually assaulted and refusing to allow her to file a PREA report. This failure came to the attention of his superiors when Ms. Williams was able to file a PREA complaint after she was sexually assaulted. Defendant Donnarumma again retaliated against Ms. Williams by slamming her head against a table and denying her access to various privileges.

## JURISDICTION & VENUE

1.      Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and the First and Eighth Amendments to the United States Constitution.

2

2.     This Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1343.

3.     Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(b)(2) because the events and omissions giving rise to this action occurred in Lycoming County, Pennsylvania, within the Middle District of Pennsylvania.

## PARTIES

4.     Plaintiff Synquila Williams is an adult individual currently incarcerated at SCI Muncy. Ms. Williams suffers from diabetes, diabetic neuropathy, hypertension, and several mental health issues, including depression and Post-Traumatic Stress Disorder.

5.     Defendant Correct Care Solutions d/b/a Wellpath, LLC is the health care provider for all Pennsylvania Department of Corrections ("DOC") facilities. It is tasked with, among other things, ensuring the health of all people incarcerated by the DOC, including monitoring ongoing medical needs and providing medical attention in a timely manner to incarcerated people. The principal office for Defendant Correct Care Solutions is in Nashville, Tennessee, and it does business in Pennsylvania. At all times relevant, Defendant Correct Care Solutions acted and will continue to act under color of state law.

6.     Defendant Dr. Paul Noel is, and was at all times relevant to this Complaint, an employee of the DOC serving as the Chief of Clinical Services for

3

the DOC. Defendant Noel is responsible for the oversight, operation, and administration of healthcare with the Commonwealth's correctional system. Defendant Noel's responsibilities include the implementation of training, policies and practices regarding access to health care generally and the DOC's procedures for providing consistent care to people with chronic conditions such as diabetes. Defendant Noel is sued in his individual and official capacities.

7.     Defendant Dr. Jacques Leclerc is, and was at all relevant times, a Physician employed by Correct Care Solutions d/b/a Wellpath, and the Pennsylvania Department of Corrections responsible for, among other things, ensuring the health and safety of people incarcerated at SCI Muncy. Defendant Leclerc is sued in his individual capacity.

8.     Defendant Dr. Rebecca Burdette is, and was at all relevant times, a Physician employed by Correct Care Solutions d/b/a Wellpath, and the Pennsylvania Department of Corrections responsible for, among other things, ensuring the health and safety of the people incarcerated at SCI Muncy. Defendant Burdette is sued in her individual capacity.

9.     Defendant Emilia Slavova CRNP is, and was at all relevant times, a Nurse employed by the Pennsylvania Department of Corrections at SCI Muncy responsible for, among other things, ensuring the health and safety of the people incarcerated there. Defendant Slavova is sued in her individual capacities.

10.     Defendant Justin Donnarumma is, and was at all relevant times, a correctional officer employed by the Pennsylvania Department of Corrections responsible for, among other things, ensuring the health and safety of people incarcerated at SCI Muncy. Defendant Donnarumma is sued in his individual capacity.

## FACTUAL ALLEGATIONS

**Ms. Williams' Diabetes Diagnosis**

11.     Plaintiff Synquila Williams arrived at SCI Muncy on December 3, 2014.

12.     Ms. Williams' chart indicates a diagnosis of Type II Diabetes in early 2015, after testing revealed HgbA1C levels of 7.7% and 7.6%.

13.     Diabetes requires effective and continuous care, including regular blood glucose checks to avoid hyperglycemia and hypoglycemia, managing carbohydrate intake to avoid swings in blood glucose levels, and detailed care for complications such as vision problems, nerve damage, digestive issues, kidney failure, and heart problems.[1]

---

[1]  Benjamin Eisenberg and Victoria Thomas, *Legal Rights of Prisoners and Detainees with Diabetes: An Introduction and Guide for Attorneys and Advocates*, American Diabetes Association, 8, http://main.diabetes.org/dorg/living-with-diabetes/correctmats-lawyers/legal-rights-of-prisoners-detainees-with-diabetes-intro-guide.pdf (last visited June 15, 2020).

**Defendants' Continued Failure to Control Ms. Williams' Type II Diabetes**

14.     The American Diabetes Association recommends A1c tests two times a year for diabetic patients who have stable glycemic control. Quarterly testing is recommended for patients whose therapy has changed or who are not meeting glycemic goals.

15.     The American Diabetes Association recommends diabetics aim for fasting glucose levels of between 70 – 130 mg/dl before meals, and less than 180 mg/dl one to two hours after meals. Higher glucose levels demonstrate poorly managed diabetes and can have serious long-term effects.

16.     The goal for most diabetic adults is HgbA1c levels less than 7%.

17.     Despite ongoing fluctuations in her HgbA1c levels and failure to consistently meet her glycemic goals, Defendants have not even tested Ms. Williams bi-annually, much less quarterly, as recommended by the American Diabetes Association.

18.     This failure to conduct regular monitoring of Ms. Williams' diabetes is the direct result of Defendants CCS and Noel's policies and practices.

19.     Following her diagnosis, Ms. Williams was prescribed Metformin. Ms. Williams initially showed improvement with a 6.4% HgbA1c in June of 2015.

20.     However, by November 2015, her HgbA1c test revealed an elevated level of 7.5%.   Ms. Williams' therapy was changed in response. She was taken off Metformin and given a prescription for Glipizide in December 2015.

21.     According to her medical records, Ms. Williams was not tested again until May 2016, despite her change in therapy.

22.     Defendants then failed to test, or ensure that Ms. Williams received follow up testing, for several months.

23.     An HgbA1c level does not appear again in her medical record until October 2017.

24.     The record shows that after 2016, Ms. Williams' HgbA1c levels have been tested only once a year despite recognition by Defendants that her diabetes was poorly controlled

25.     In March of 2019, Ms. Williams' blood glucose was tested twice while she was at the hospital for an asthmatic emergency. Her readings were 191 mg/dL and 201 mg/dL.

26.     Following this visit, Ms. Williams' fasting blood glucose was tested on April 16, 2019, revealing that her blood sugar was 163 mg/dL.

27.     Ms. Williams had her HgbA1c tested on September 22, 2019, which revealed that her levels had skyrocketed to 10.1%.

28.     Ms. Williams' blood sugar medication, Glipizide, was increased from a 5mg dose to a 10mg dose in response.

29.     The record demonstrates that Ms. Williams' blood glucose was not tested again until October 18, 2019, when her fasting blood glucose was 199 mg/dL.

30.     At her chronic care appointment on November 8, 2019, Dr. DeSantis noted that the control of Ms. Williams' diabetes was "poor" and that her status had worsened.

31.     He issued her a new prescription for Glipizide ER. When he prescribed this, Dr. DeSantis told Ms. Williams that she required a prescription for Glipizide ER (standing for "extended release") and not regular Glipizide because she needed a timed-release mediation.

32.     The prescription for Glipizide ER was never filled because it is not on Defendant CCS's formulary list.

33.     Ms. Williams was denied this necessary medicine due to a solely administrative reason in accordance with policies and practices overseen by Defendants CCS and Noel, aggravating her already poorly controlled diabetes.

34.     As a result, Ms. Williams received no medication for her diabetes from approximately October 25, 2019 to November 26, 2019.

35.     On November 26, 2019, Ms. Williams was seen by Dr. Schrack who noted that her "medication had fallen off," as it was not renewed in October.

36.    Dr. Schrack also questioned why the Glipizide ER, a "nonformulary medicine" had been prescribed.

37.    Ms. Williams received a new prescription for Glipizide, which was increased to 10mg tablets taken two times a day.

38.    Ms. Williams requested sick call to follow up on her blood sugar and pain on December 31, 2019. Medical staff tested her blood sugar, which was 221 mg/dL after breakfast.

39.    Starting in January 2020, Ms. Williams was supposed to have regular glucose testing due to her worsening diabetes to determine if she needed to start taking insulin.

40.    Her medical records reflect that the checks were scheduled to be taken every week on Wednesday and Friday for a month.

41.    These checks only happened once, on January 22, 2020, where Ms. Williams had a glucose reading of 223 mg/dL.

42.    The Pennsylvania Department of Corrections recognizes that some medical conditions, such as Hepatitis C, COPD and diabetes, require more frequent monitoring.

43.    As a result, Defendants CCS and Noel have created policies and procedures for "chronic care clinics."

44.     Pursuant to these policies and procedures, even people with stable chronic conditions should have "Chronic Care" appointments twice a year.

45.     The policies and practices for Chronic Care clinics do not provide for adequate additional monitoring of individuals with conditions that are poorly controlled.

46.     Despite Ms. Williams' diabetes being poorly controlled throughout her time at SCI Muncy, Defendants have not ensured that she meet even this minimum level of monitoring, let alone the increased visits necessitated by her poorly controlled diabetes and high testing levels.

**Defendants' Continued Failure to Treat Ms. Williams' Diabetic Neuropathy**

47.     The consequences of improper care of diabetes can be devastating and include amputations, infections, vision loss and blindness, hospitalization, brain damage, chronic kidney disease, peripheral artery disease, and death.

48.      Diabetic neuropathy is a serious and frequent complication of diabetes that can cause nerve damage throughout the body. Symptoms can manifest in the legs and feet, the digestive system, the urinary tract, and blood vessels in the heart. The progression of diabetic neuropathy can be slowed with consistent blood sugar management. If diabetic neuropathy is not treated or effectively slowed, it can become necessary to amputate affected limbs. Poorly managed diabetes and diabetic neuropathy is evidenced by discoloration of the lower limbs and plantar peeling.

According to the American Diabetes Association, neuropathy results in an inability for nerves to control moisture in the feet, causing skin peeling.

49.    The American Diabetes Association recommends that all diabetic patients should be assessed for diabetic neuropathy upon diagnosis of diabetes, and at least annually thereafter.

50.    The record does not indicate that Ms. Williams was assessed for diabetic neuropathy when she was first diagnosed with diabetes.

51.    Despite exhibiting symptoms of diabetic neuropathy since at least 2016, Ms. Williams was not diagnosed until several years later.

52.    On July 19, 2016, Ms. Williams went to the infirmary complaining of pain and redness in her left big toe.

53.    After multiple visits with differing diagnoses and ineffective treatment, the increasing pain and swelling in her toe required that Ms. Williams be sent to the emergency room at a nearby hospital on July 27, 2016.

54.    On that date, a physician noted that Ms. Williams suffered from diabetes, and that the hospital needed to "rule out" whether the bacterial infection had spread to the joint.

55.    The doctor treating Ms. Williams at the outside hospital recommended an emergency podiatrist visit for the following day and even set up the appointment.

56.     Prison officials immediately canceled the emergency podiatry appointment without explanation and did not reschedule it.

57.     Medical staff at SCI Muncy did not provide Ms. Williams with any of the medication prescribed by the hospital doctor.

58.     On October 13, 2017, Ms. Williams went to sick call to report new pain in her feet. The description in her chart mentions "white scaly flakes" between her toes and an oval-shaped "patch" on her right foot measuring 5 cm. Ms. Williams was given moisturizing cream for her feet. Her neuropathy was not assessed or treated.

59.     On December 3, 2017, Ms. Williams was seen once again for right leg pain and numbness in her toes, along with discoloration in her right foot.

60.     Ms. Williams went to sick call again in April 2018 for pain in her feet. She was referred to a foot clinic where they merely clipped her toenails and provided no additional treatment. Her neuropathy was not assessed or treated.

61.     On August 21, 2018, Ms. Williams had an infirmary stay for persistent asthma and "diabetic foot," in which Defendant Leclerc noted that she had diabetic dermopathy in her right foot.

62.     The chart notes show that Defendant Leclerc did not provide a plan for treatment going forward; the notes further state that no medications were needed.

63.     On September 10, 2018, Ms. Williams was seen again, reporting that both of her feet were swollen and had been throbbing for several months.

12

64.     Ms. Williams also had plantar peeling and discoloration on both feet. During this visit, the nurse again noted Ms. Williams' history of diabetes.

65.     Ms. Williams was only prescribed shower shoes. Neither her diabetes nor her neuropathy were assessed or treated.

66.     On September 17, 2018, Ms. Williams put in a sick call request, reporting pain, tingling, and numbness in both of her feet.

67.     She was prescribed Mobic (Meloxicam), a Non-Steroidal Anti-Inflammatory Drug (NSAID) used to control arthritis. Mobic is contraindicated for people with high blood pressure, heart disease and diabetes. Neither her diabetes nor her neuropathy were assessed or properly treated.

68.     During an appointment on September 24, 2018, Defendant Slavova saw Ms. Williams for increased numbness and tingling in her legs, increased general pain, and specific pain in her right big toe.

69.     At this appointment, Ms. Williams asked Defendant Slavova about diabetic neuropathy, a condition which she had recently learned about.   Defendant Slavova did not assess or provide appropriate treatment for Ms. Williams' neuropathy.

70.     In response, Ms. Williams' dosage for Mobic was increased, despite the contraindication and that the medication was not alleviating her pain.

71.    She was seen in the foot clinic where they clipped her toenails. Her neuropathy was not assessed or treated.

72.    On October 17, 2018, Ms. Williams again asked for something to relieve the leg and foot pain induced by her diabetic neuropathy.

73.    After complaining of numbness in her feet, Ms. Williams was seen on October 31, 2018 by Defendant Leclerc.

74.    He noted "mild diabetic neuropathy" and resumed the Mobic prescription.

75.    On December 11, 2018, Ms. Williams was seen by Defendant Slavova. Despite observing that a "right lateral foot lesion started as a small quarter size above fifth toe and grew to today's size despite treatment," as well as onychomycosis, Ms. Williams only had her toenails clipped and was given moisturizing lotion. Neither her diabetes nor her neuropathy were assessed or treated.

76.    Onychomycosis is a fungal infection of the nail that is found at disproportionately high rates in patients with diabetes. For diabetic patients, onychomycosis is "more than a cosmetic nuisance; it increases the risk for other foot disorders and limb amputation."[2]

---

[2] Jason A. Winston and Jami L. Miller, *Treatment of Onychomycosis in Diabetic Patients*, 24 Clinical Diabetes 160, 160 (2006).

77.     The standard for diagnosing onychomycosis is clinical impression with one confirmatory laboratory finding.

78.     The removal of diseased nails can be used as an adjunctive therapy, but "not as the sole therapy for onychomycosis."[3]

79.     Knowing the possible complications inherent to Type II diabetes, Ms. Williams again put in a sick call on January 24, 2019, for the pain caused by the infection in her toe, afraid she would lose the toe.

80.     On March 18, 2019, Ms. Williams requested to see a physician, due to her ongoing, chronic foot pain and chest pain. She specifically reported that her chest was tight and that the toenail on her right foot was now being forced all the way up, causing her excruciating pain.

81.     Defendant Slavova told Ms. Williams that she would have to choose which of her medical needs to have addressed at the appointment.

82.     Forced to choose between two serious medical problems, Ms. Williams requested medical attention for her foot. Defendant Slavova referred her to the foot clinic, only to have her toenails clipped. Ms. Williams' neuropathy was not assessed or treated.

83.     Defendant Slavova also denied Ms. Williams' request for a breathing treatment to help alleviate her chest pain.

---

[3] *Id*. at 165.

84. Ms. Williams' respiratory symptoms significantly worsened over the next two days. On March 22, after stating that she could not breathe. A nurse checked her vitals, finding her heart rate was elevated at 148 beats per minute, her respiration elevated at 24 breaths per minute and her blood pressure normal at 120/80.

85. Ms. Williams had steroids administered, which were ultimately unsuccessful.

86. That night, Ms. Williams had to summon guards on an emergency basis.

87. Medical staff determined that her blood pressure was 255/115, her heart rate was 160 and her blood sugar was 400.

88. She was then rushed to the hospital

89. The physicians at the hospital diagnosed this incident as "acute hypoxemic respiratory failure related to asthma exacerbation."

90. The physicians at the outside hospital also prescribed Ms. Williams Gabapentin for her neuropathy.

91. This medication was immediately effective in mitigating Ms. Williams' neuropathy pains, providing Ms. Williams with relief for the first time in over three years.

92. When Ms. Williams returned from the hospital, Defendants Slavova and CCS refused to continue the Gabapentin prescription.

16

93.     They did not assess her neuropathy, nor did they provide an alternative treatment to address her pain outside of the medication she was already on.

94.     On April 6, 2019, Ms. Williams was sent to the infirmary again for severe toe pain. A nurse noted that the toe appeared to have a fungal infection. Neither her diabetes nor her neuropathy were assessed or treated.

95.     Ms. Williams was seen by Dr. Schrack on April 11, 2019, to address the pain in her big toe. Dr. Schrack ordered a podiatry consult and prescribed Lyrica for the pain.

96.     On April 17, 2019, a doctor noted that the podiatry consult had still not been scheduled. The doctor further observed that Ms. Williams continued to experience toe pain and had "necrotic skin" on her right foot.

97.      Ms. Williams submitted a sick call request on April 19, 2019, because she felt like her "whole right side" was swelling, and she was experiencing diabetic pain and numbness.

98.     She expressed additional concern because of her diabetes and the fact that her toe infection had been ongoing for several years.

99.      At this appointment, the nurse educated her on the "difference between onychomycosis and bacterial infection." Both onychomycosis, a fungal infection, and bacterial infections increase the risk of limb amputation for diabetics with neuropathy.

100.   On July 1, 2019, Ms. Williams felt "tingling, burning, [and] needles," which a nurse noted was likely due to Ms. Williams' neuropathy.

101.   Ms. Williams finally saw a podiatrist on July 22, 2019, who noted the appointment was because of her "toenail and history of hospitalization."

102.   At the appointment, the doctor examined her "thick, yellow toenail" and ran labs for onychomycosis.

103.   The lab results came back on August 3, 2019, confirming onychomycosis – a condition that Ms. Williams' providers had been aware of and noted in her medical charts since 2018.

104.   Ms. Williams again complained of increased neuropathic pain down her legs and in her feet on September 13, 2019.

105.   At this appointment, the healthcare provider noticed "decreased sensory to cotton wisp," due to her neuropathy. Ms. Williams' Lyrica prescription was increased.

106.   Despite her continued, increased pain, Defendants cancelled Ms. Williams' Lyrica prescription for three months from December 2019 until March 2020.

107.   Ms. Williams continues to experience infections in her toe and neuropathic pain and numbness in her legs and feet.

108.   Defendant Noel has not ensured that DOC's policies and procedures relating to the care of people with diabetes provide for adequate monitoring and treatment of the complications of diabetes such as diabetic neuropathy.

109.   Upon information and belief, Defendant Correct Care Solutions has a practice of minimizing and ignoring complaints of foot and leg pain in people with diabetes, despite the frequent occurrence and potentially grave consequences of diabetic neuropathy.

110.   Upon information and belief, Defendant Correct Care Solutions has a practice of denying medically necessary prescriptions for being non-formulary, even when formulary medications are inappropriate for a patient or have proven ineffective in treating that patient's needs.

111.   As a result of the policies and practices of Defendant Correct Care Solutions, Ms. Williams has experienced continuous and worsening infections and pain in her feet and legs for several years.

112.   Given the grave consequences of diabetic retinopathy, including potential toe, foot or leg amputation, Ms. Williams has lived in daily fear for her wellbeing since 2016.

113.   As early as July 2016, doctors connected Ms. Williams' pain and infection with her diabetes diagnosis and potential neuropathy, yet four years later

she still has not received successful treatment and her diabetes and related symptoms continue to worsen.

**Ms. Williams' Digestive Problems**

114.   Starting in 2016, Ms. Williams began to complain of severe stomach pain and constipation. At a visit on May 2, 2016, she reported having abdominal pain for the prior three weeks.

115.   She saw a medical professional again the next day to say she had vomited after eating.

116.   On May 4, she explained the pain was intermittent but at its worst, "it doubles me over." She had been ill twice the night before, producing emesis that looked like coffee grounds; the medical notes indicate she was vomiting up blood.

117.   At 6:30 p.m. that day, Ms. Williams reported that she had vomited a moderate amount of undigested food and asked to go to the hospital.

118.   An x-ray showed "abundant" stool in her colon.

119.   By May 11, 2016, she was complaining about pain and constipation again.

120.   From May until December 2016, Ms. Williams was seen by health professionals at SCI Muncy ten times for stomach pain, including two stays in the infirmary. Throughout this period Ms. Williams did not receive treatment that alleviated her pain.

121.   At one appointment, Defendant Burdette observed that an endoscopy would be helpful but that "would never happen."

122.   Upon information and belief, Ms. Williams' could not receive an endoscopy because of Defendant Correct Care Solutions' policy or practice of denying costlier diagnostic procedures.

123.   On December 20, 2016, Ms. Williams again complained that when she ate, she would experience great pain until she vomited, which brought relief.

124.   Over this period, Ms. Williams lost roughly twenty-five pounds and began to feel like a "shell of her former self."

125.   At the end of May 2017 Ms. Williams sought treatment because she was again experiencing abdominal pain and vomiting.

126.   In August 2017, Ms. Williams had another severe bout of constipation and an x-ray showed "abundant stool" in her colon.

127.   On August 15, 2017, there was blood in her stool.

128.   In October 2017, when Ms. Williams again complained of pain and constipation, she received three enemas in one day, none of which provided her relief.

129.   On June 6, 2018, Ms. Williams found blood in her stool, following several days with no bowel movements.

130.    Ms. Williams stopped trying to get help for her abdominal issues because CCS staff did nothing for her but prescribe laxatives and she could not afford the co-payments.

131.    Upon information and belief, it is the policy or practice of Defendant Correct Care Solutions and its' staff to only prescribe laxatives when people complain of stomach pain or limited bowel movements, without further diagnostic care or diagnosis.

132.    On April 30, 2019, during an infirmary visit, Ms. Williams let her CCS provider know that she only had bowel movements about once every two weeks, and that when she did, it caused her to bleed.

133.    Defendant Correct Care Solutions and that provider did not take any steps to diagnose or provide treatment to Ms. Williams for these issues.

134.    Ms. Williams continues to suffer from constipation and abdominal pain.

135.    Poorly managed diabetes can cause "diabetic gastroparesis," which causes the digestive system to slow down and not function properly. Gastroparesis can cause nausea, vomiting of undigested food, and problems with blood sugar levels.[4]

---

[4]    *Gastroparesis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/gastroparesis/symptoms-causes/syc-20355787 (last visited June 29, 2020).

136.   An endoscopy is one way of diagnosing gastroparesis. In spite of knowing about Ms. Williams's diabetes, Defendant Correct Care Solutions has made no effort to connect her digestive problems to her diabetes or to provide meaningful treatment.

137.   Defendant Noel has not ensured that DOC's policies and procedures relating to the care of people with diabetes provide for adequate monitoring, testing, and treatment of the complications of diabetes such as diabetic gastroparesis.

**Retaliation by Defendant Donnarumma**

138.   Ms. Williams has a long history of negative interactions with Defendant Donnarumma.

139.   In coordination with Corrections Officer Taylor Stark, Defendant Donnarumma repeatedly denied Ms. Williams phone time, showers, and common room time without justification.

140.   For example, on or about December 16, 2016, Defendant Donnarumma refused to let Ms. Williams leave her cell for sick call without giving a reason.

141.   Ms. Williams has filed multiple grievances regarding Corrections Officer Stark, Defendant Donnarumma, and their ongoing harassment of her.

142.   Ms. Williams was sexually harassed by her cellmate for the first time on August 24, 2017. In this incident, Ms. Williams' cellmate told her that the

cellmate was "going to catch a PREA[5] case" because the cellmate was attracted to Ms. Williams.

143.   Ms. Williams understood "catching a PREA case" to mean that her cellmate intended to sexually assault her.

144.   Upon information and belief, this cellmate had previously been reported by other incarcerated women for sexual assault.

145.   When Ms. Williams tried to report this threat, Defendant Donnarumma laughed at her and refused to file the PREA report.

146.   Defendant Donnarumma took no action to protect Ms. Williams from her cellmate or prevent her from future harm.

147.   This goes directly against the Pennsylvania Department of Corrections' PREA policy, which states that the DOC has a "zero-tolerance policy" in regards to sexual harassment and sexual assault.

148.   Pursuant to this "zero-tolerance policy" all staff, including Defendant Donnarumma, are required to report all complaints of potential sexual harassment and abuse to security staff.

---

[5]   PREA is the Prison Rape Elimination Act which provides standards that correctional institutions are required to follow relating to the prevention, reporting, investigation, and discipline relating to claims of sexual harassment, abuse or assault.   Within the Pennsylvania Department of Corrections, allegations of sexual assault are commonly referred to as "filing a PREA report," even though incarcerated people are only required to verbally report the abuse to any staff member, not complete any written report.

149.   Under DOC Policy, all staff, including Defendant Donnarumma, are required to undergo PREA training and to sign an "Acknowledgment of Understanding and Duty to Report."

150.   When a PREA report is made, DOC staff are required to separate the individuals involved to protect the reporting person from harm.

151.   Upon information and belief, Defendant Donnarumma refused to notify anyone of Ms. Williams' PREA complaint because of her past complaints and grievances against him and Corrections Officer Stark.

152.   Since Defendant Donnarumma refused to file a PREA report, Ms. Williams remained celled with her cellmate.

153.   On August 27, 2017, Ms. Williams' cellmate stroked Ms. Williams' breasts without consent while Ms. Williams was waiting to be released from her cell to go to a church service.

154.   On August 27, 2017, Ms. Williams' cellmate was moved to another cell on the same unit.

155.   At this point, Ms. Williams was able to file a PREA report regarding the actions of her cellmate.

156.   On August 28, 2017, Ms. Williams' former cellmate, who sexually harassed her the day before, physically attacked her in the food line.

157.   Following this attack, Ms. Williams returned to her unit and attempted to roll a cigarette in the common room – something she and others did on a regular basis.

158.   Defendant Donnarumma ordered her to stop.

159.   This led to an argument between Ms. Williams and Defendant Donnarumma.

160.   Defendant Donnarumma responded by slamming Ms. Williams' head against the table so forcefully that half of Ms. Williams' face became swollen and bruised, and her lip was split open.

161.   Ms. Williams was immediately placed in disciplinary detention. She was kept in the Restricted Housing Unit for thirty days.

162.   While in the Restricted Housing Unit, the officers would ignore Ms. Williams.

163.   Ms. Williams has a history of mental health conditions, one of which is PTSD.

164.   PTSD is a mental condition that develops after experiencing a shocking, dangerous, or unexpected event. Symptoms include, but are not limited to flashbacks, difficulty sleeping, and panic attacks. PTSD can cause a massive interference in a person's everyday routine and the degradation of personal relationships.

165.   The assaults by Ms. Williams' cellmate and Defendant Donnarumma, as well as Defendant Donnarumma's response to them, exacerbated Ms. Williams' pre-existing mental health conditions, specifically her PTSD.

166.   PTSD and other serious mental illnesses are known to be aggravated by the conditions in the Restricted Housing Unit, a form of solitary confinement.

167.   Due to her PTSD, while housed in solitary confinement Ms. Williams had psychotic episodes in which she heard voices.

168.   While in the RHU, Ms. Williams told the correctional officers on duty that she was suicidal. They responded by walking away.

169.   When another staff member did come to check on Ms. Williams, she had a sheet around her neck.

170.   Ms. Williams was then handcuffed and taken to another unit. She was stripped naked and put in a green smock, and was left there the entire night without a mattress.

171.   She was not seen by a psychiatrist that evening and in the morning, she was brought to D pod.

172.   While in the RHU, Ms. Williams was denied food as well as her medication on at least one occasion.

173.   After Ms. Williams was released from the Restricted Housing Unit, Defendant Donnarumma never delivered commissary items that Ms. Williams ordered and paid for while she was in the Restricted Housing Unit.

174.   In September 2017, Defendant Donnarumma forced Ms. Williams to reduce the number of her possessions, including throwing out some of her records.

## CLAIMS

### COUNT I: Deprivation of Eighth Amendment Right to Be Free from Cruel and Unusual Punishment

(Against all Defendants excluding Defendant Donnarumma)

175.   Plaintiff hereby incorporates by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

176.   Defendants violated Ms. Williams' right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution through their deliberate indifference to Ms. Williams serious medical needs, including but not limited to their failure to adequately treat her diabetes, diabetic neuropathy and gastrointestinal issues.

### COUNT II: Retaliation for Exercising First Amendment Rights

(Against Defendant Donnarumma)

177.   Plaintiff hereby incorporates by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

178.   Ms. Williams engaged in protected First Amendment activity when she filed complaints and grievances about the harassment by Defendant Donnarumma and corrections officer Stark and when she filed a PREA complaint related to her sexual assault.

179.   Defendant took adverse action against Ms. Williams, including but not limited to refusing to report her PREA complaint, using force against her by slamming her head into a table during a verbal argument and denying her access to various privileges, sufficient to deter a prisoner of ordinary firmness from engaging in further protected speech.

180.   Ms. Williams' protected First Amendment speech was a motivating factor in Defendant's decision to take adverse actions against her.

181.   These actions were undertaken intentionally, with malice and/or with reckless disregard for Ms. Williams' rights.

## **RELIEF**

Wherefore, Plaintiff Synquila Williams respectfully requests that the Court grant the following relief:

A. A declaratory judgment that Defendants violated Ms. Williams' rights under the First and Eighth Amendments of the United States Constitution;

B.  Injunctive relief requiring that Defendants provide Ms. Williams with appropriate care, testing and monitoring for her gastrointestinal issues and her diabetes and its associated complications;

C.  Injunctive relief requiring Defendants Correct Care Solutions and Noel develop a written protocol for treating and managing diabetes that meets the standards of care;

D.  Injunctive relief prohibiting Defendants from retaliating against Ms. Williams for exercising her First Amendment right to file grievances and complaints;

E.  An award of appropriate compensatory and punitive damages against Defendants in an amount to be determined by the finder of fact;

F.  Reasonable attorneys' fees and costs; and

G.  Such other relief as this Court deems just and proper.


Respectfully submitted,

*/s/ Alexandra Morgan-Kurtz*
Alexandra Morgan-Kurtz
PA ID No. 312631
PA Institutional Law Project
100 Fifth Avenue, Ste 900
Pittsburgh, PA 15222
T: (412) 434-6175
amorgan-kurtz@pailp.org

*/s/ Amy Ernst*_____
Amy Ernst
PA ID No. 328055
PA Institutional Law Project
115 Farley Cir., Suite 110
Lewisburg, PA 17837
T: (570) 523-1104
aernst@pailp.org

*Attorneys for Plaintiff*